DECISION AND JOURNAL ENTRY
{¶ 1} After hitting the windshield of her car during a collision, Melissa Cutlip was taken by ambulance to the Avon Emergency Care Center. A nurse withdrew blood samples from her in accordance with the hospital's standard procedure, which included swabbing the area with an alcohol-based antiseptic. By the time Patrolman Franklin Walker arrived at the hospital to ask for Ms. Cutlip's consent to test her blood for the presence of alcohol, she was strapped to a gurney, waiting to be transported by helicopter to a different hospital. Because Patrolman Walker did not have time to collect additional blood samples from Ms. Cutlip using a non-alcohol-based antiseptic, he could only test the blood that had already been drawn. The trial court suppressed the test results because Ms. Cutlip's blood was not collected in substantial compliance with Section 4511.19 of the Ohio Revised Code and Section 3701-53-05 of the *Page 2 
Ohio Administrative Code. Because Section 3701-53-05(B) of the Ohio Administrative Code provides that "[n]o alcohols shall be used as a skin antiseptic," this Court affirms.
 FACTS {¶ 2} On December 11, 2005, Ms. Cutlip collided with another vehicle, propelling her into the windshield of her car. When Patrolman Walker arrived, he saw that she was bleeding profusely from the face. Because of Ms. Cutlip's injuries, he did not have her perform any field sobriety tests. She was transported to the hospital, where a nurse swabbed her with an alcohol-based antiseptic and drew seven tubes of blood. Had the nurse known that the blood was needed for law enforcement purposes, she would have used a Betadine swab instead of the alcohol-based antiseptic.
 {¶ 3} Because Patrolman Walker had smelled alcohol on Ms. Cutlip's breath, he followed her to the hospital to obtain a blood sample from her. By the time he arrived, the hospital had learned that Ms. Cutlip was pregnant. It, therefore, had decided to transport her by helicopter to a different hospital. Patrolman Walker found Ms. Cutlip strapped to a gurney awaiting transport. According to Patrolman Walker, he had only a couple of minutes to review a blood-alcohol test consent form with her and did not have time to obtain additional blood samples. Although Ms. Cutlip was unable to sign the consent form, she agreed to let her blood be tested for alcohol. The nurse gave Patrolman Walker two of the tubes of blood that she had previously drawn from Ms. Cutlip.
 {¶ 4} The police initially sent Ms. Cutlip's blood to a laboratory in Minnesota. Because that lab was not certified by the Ohio Department of Health, the police had to have the blood retested by a certified lab. During the eight days that it took for the blood samples to be *Page 3 
transported from the first lab to the second lab, they were not refrigerated. The certified lab determined that Ms. Cutlip's blood-alcohol level at the time of the collision was .212.
 {¶ 5} The Grand Jury indicted Ms. Cutlip on two counts of driving under the influence, two counts of aggravated vehicular assault, and two counts of vehicular assault. Ms. Cutlip moved to suppress the results of the blood test, arguing that the samples tested were not collected in conformance with Section 3701-53-05 of the Ohio Administrative Code. At a hearing on the motion, experts for the State testified that the test results were not affected by the nurse's use of an alcohol-based antiseptic. An expert from the certified lab testified that he had performed his own experiments and found that the use of an alcohol-based antiseptic changed the blood-alcohol content of a sample by no more than .005. An expert from the Minnesota lab testified that the alcohol contained in the swab is different from the alcohol in beverages. He also testified that his laboratory's equipment is sophisticated enough to distinguish between the two types of alcohol. Nevertheless, the trial court granted Ms. Cutlip's motion to suppress, concluding that, because "an alcohol-based solution was used to clean the injection site, the state has not shown substantial compliance with OAC 3701-53-05(B)." The State has appealed, assigning three errors.
 MOTION TO SUPPRESS {¶ 6} The State's first assignment of error is that the trial court incorrectly granted Ms. Cutlip's motion to suppress. It has argued that the blood-alcohol test results are admissible because her blood was collected in substantial compliance with Section 3701-53-05 of the Ohio Administrative Code.
 {¶ 7} A motion to suppress evidence presents a mixed question of law and fact. State v. Burnside, 100 Ohio St. 3d 152, 2003-Ohio-5372, at ¶ 8. A reviewing court "must accept the trial *Page 4 
court's findings of fact if they are supported by competent, credible evidence." Id., but see State v. Metcalf, 9th Dist. No. 23600,2007-Ohio-4001, at ¶ 14 (Dickinson, J., concurring). The reviewing court "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." Burnside, 2003-Ohio-5372, at
 {¶ 8} When a defendant challenges the results of a blood-alcohol test, "the state must show substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm. Code Chapter 3701-53 before the test results are admissible."State v. Mayl, 106 Ohio St. 3d 207, 2005-Ohio-4629, at paragraph one of the syllabus. Section 4511.19(D)(1) is a "three paragraph gate-keeping statute." Id. at ¶ 20. It provides the time in which a blood sample must be collected after an alleged violation, delineates who may collect the sample, and provides the methods that must be used to analyze the sample. Regarding the methods of analysis, Section 4511.19(D)(1)(b) provides that a defendant's blood "shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director of health pursuant to section 3701.143 of the Revised Code." Burnside, 2003-Ohio-5372, at ¶ 9
 {¶ 9} The Ohio Director of Health has promulgated regulations pursuant to Section 3701.143 regarding how blood samples must be collected. Section 3701-03-05(A) of the Ohio Administrative Code provides that "[a]ll samples shall be collected in accordance with [R.C] 4511.19. . . ." "When collecting a blood sample, an aqueous solution of a non-volatile antiseptic shall be used on the skin. No alcohols shall be used as a skin antiseptic." Ohio Admin. Code 3701-53-05(B). "Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested." Ohio Admin. Code 3701-53-05(C). *Page 5 
"Blood . . . containers shall be sealed in a manner such that tampering can be detected. . . ." Ohio Admin. Code 3701-53-05(E). "While not in transit or under examination, all blood and urine specimens shall be refrigerated." Ohio Admin. Code 3701-53-05(F).
 {¶ 10} The Ohio Supreme Court has adopted "a burden-shifting procedure to govern the admissibility of alcohol-test results." Burnside,2003-Ohio-5372, at ¶ 24. "The defendant must first challenge the validity of the alcohol test by way of a pretrial motion to suppress. . . ." Id. "After a defendant challenges the validity of test results in a pretrial motion, the state has the burden to show that the test was administered in substantial compliance with the regulations prescribed by the Director of Health. Once the state has satisfied this burden and created a presumption of admissibility, the burden then shifts to the defendant to rebut that presumption by demonstrating that he was prejudiced by anything less than strict compliance." Id.
"[E]vidence of prejudice is relevant only after the state demonstrates substantial compliance with the applicable regulation." Id.
 {¶ 11} In Burnside, the Supreme Court discussed the substantial compliance standard, recognizing that it presented a "fundamental problem." Id. at ¶ 32. The Court noted that "a judicial determination that an alcohol test, although not administered in strict compliance with the alcohol-testing regulations, is reliable and therefore admissible may subvert the rule-making authority and the statutory mandate of the Director of Health." Id. It noted that "the General Assembly instructed the Director of Health — and not the judiciary-to ensure the reliability of alcohol-test results by promulgating regulations precisely because the former possesses the scientific expertise that the latter does not." Id. (emphasis in original). "A court infringes upon the authority of the Director of Health when it holds that the state need not do that which the director has required."Id. at ¶ 33. The Court concluded that "[t]o avoid usurping a function that *Page 6 
the General Assembly has assigned to the Director of Health . . . we must limit the substantial-compliance standard . . . to excusing only errors that are clearly de minimis." Id. at ¶ 34. The Court "characterized those errors that are excusable under the substantial-compliance standard as `minor procedural deviations.'"Id. (quoting State v. Homan, 89 Ohio St. 3d 421, 426 (2000)).
 {¶ 12} The State has argued that the use of an alcohol swab in this case was a de minimis, procedural violation. It has noted that the nurse used a sterile dry needle, that she drew Ms. Cutlip's blood into a vacuum container containing a solid anticoagulant, that the container was properly sealed, and that the blood was refrigerated at all times when it was not in transit or under examination. It has further noted that, although the nurse testified that it is likely that she used an alcohol-based swab, it is not certain that she did. It has also pointed out that both laboratories that tested Ms. Cutlip's blood-alcohol level determined that it was well above the legal limit. It has further noted that the only reason the officer was not able to obtain a legal blood draw was because members of the medical staff were more concerned with saving Ms. Cutlip's life and the life of her unborn child than gathering evidence to be used against her. According to the State, if Patrolman Walker had insisted on a compliant blood draw, it would have placed Ms. Cutlip's and her unborn child's lives at risk. Even if he had insisted, it is uncertain whether the attending medical personnel would have complied with his request.
 {¶ 13} In Burnside, the State argued "that it substantially complied with the alcohol-testing regulations notwithstanding its failure to establish the use of a solid anticoagulant." Burnside, 2003-Ohio-5372, at ¶ 36. The Supreme Court disagreed, noting that "Ohio Adm. Code 701-53-05(C) declares in no uncertain terms that `[b]loodshall be drawn . . . into a vacuum container with a solid anticoagulant.'" Id. (emphasis in original). The Court noted that the regulation's "language does not advise the use of a solid anticoagulant when drawing a blood *Page 7 
sample; it demands it." Id. (emphasis in original). The Court determined it could not "conclude that such an error is de minimis and therefore permissible under the substantial-compliance standard." Id.
 {¶ 14} Similarly, Section 3701-53-05(B) of the Ohio Administrative Code provides that "[n]o alcohols shall be used as a skin antiseptic." It does not advise the State not to use alcohol as an antiseptic, it demands it. This Court, therefore, cannot conclude that the nurse's use of an alcohol-based antiseptic swab was a minor procedural deviation that was "clearly de minimis." See Burnside, 2003-Ohio-5372, at ¶ 34. The trial court correctly concluded that Ms. Cutlip's blood samples were not drawn in substantial compliance with Section 4511.19(D)(1)(b) of the Ohio Revised Code and Section 3701-53-05(B) of the Ohio Administrative Code. See State v. White, 12th Dist. No. CA2006-05-111, 2007-Ohio-350, at ¶ 14 (concluding State had not substantially complied with Section 3701-53-05(B) of the Ohio Administrative Code because isopropyl alcohol had been used to clean the injection site).
 {¶ 15} The State has also argued that its experts established that the use of an alcohol-based antiseptic would have little effect on a blood-alcohol test. As the Supreme Court noted in Burnside, however, "[t]his argument is properly directed not to us but to the Director of Health, whose charge it is to promulgate regulations that will ensure the reliability of alcohol-test results. To hold otherwise would be to speculate, with neither the requisite expertise nor the statutory authority, whether [using an alcohol-based antiseptic] affected the reliability of the alcohol-test results." Burnside, 2003-Ohio-5372, at¶ 37. Accordingly, even though the State offered expert testimony regarding the accuracy of the test results, this Court would usurp the authority of the Director of Health if it allowed the State to do what the Director has prohibited. *Page 8 
 {¶ 16} The State has further argued that this Court should create an exception regarding the laboratory certification requirement and let the Minnesota lab's test results be admitted. See State v. Mayl,106 Ohio St. 3d 207, 2005-Ohio-4629, at ¶ 23-24 (citing R.C. 3701.143). Because Ms. Cutlip's blood was not drawn in substantial compliance with Section 3701-53-05(B) of the Ohio Administrative Code, however, it is not necessary to consider whether the Minnesota lab's test results of those samples should be admitted. The State's first assignment of error is overruled.
 MODIFYING BURNSIDE {¶ 17} The State's second assignment of error is thatBurnside should be modified to permit the admission of a blood-alcohol test result, even when an alcohol swab has been used as an antiseptic, if there is proof that a laboratory has mechanically excluded the effect of the isopropyl alcohol in the swab. This Court has no authority to modify a decision of the Ohio Supreme Court. As the Tenth District noted in Gehad Mandi Inc. v. Ohio State Liquor Control Comm'n, 10th Dist. No. 05AP-1181, 2006-Ohio-3081, at ¶ 7, "[t]his court as an intermediate appellate court, is bound by, and must follow and apply, the decisions of the Ohio Supreme Court. This court has no authority to modify, and much less to overrule, any decision of the Ohio Supreme Court. . . . This court is required to follow and apply Ohio Supreme Court decisions, as to the law, even if the appellate judges disagree with the Ohio Supreme Court's determination." The State's second assignment of error is overruled.
 PUBLIC POLICY {¶ 18} The State's third assignment of error is that the suppression of the blood-alcohol test result violates public policy and produces an unjust result. It has argued that, in light of "the frequency with which [Section] 4511.19 has been amended, it can be inferred that the Ohio *Page 9 
General Assembly is quite concerned with punishing individuals who operate motor vehicles while impaired. . . ." It has argued that "[t]o permit individuals to escape punishment for per se violations] of the statute due to a de minimis violation of the Ohio Department of Health regulation violates public policy. . . ." It has further argued that law enforcement officers should not have to insist on compliant blood draws at the expense of human life and that individuals who have operated motor vehicles while impaired should not escape the consequences of their decisions just because medical personnel value those individuals' lives more than compliance with the standard for legal blood draws. It has also argued that it is uncertain whether attending medical personnel would have complied with a request by Patrolman Walker for another blood draw, because that would have delayed Ms. Cutlip's transfer to another hospital for life-saving medical treatment. Finally, it has argued that it is inequitable to suppress the test results just because the nurse used an alcohol swab while trying to administer medical treatment to Ms. Cutlip as quickly as possible.
 {¶ 19} "Where the General Assembly has spoken, and in so speaking violated no constitutional provision, [courts] must not contravene the legislature's expression of public policy." Painter v. Graley,70 Ohio St. 3d 377, 385 (1994). "Judicial policy preferences may not be used to override valid legislative enactments, for the General Assembly should be the final arbiter of public policy." Id. (quoting State v.Smorgala, 50 Ohio St. 3d 222, 223 (1990)). The General Assembly has specifically delegated authority to the Director of Health to determine standards for the collection and analysis of bodily substances. This Court, therefore, declines to consider whether the suppression of the blood-alcohol test results in this case violates public policy. The State's third assignment of error is overruled. *Page 10 
 CONCLUSION {¶ 20} Because the nurse used an alcohol-based antiseptic when she drew Ms. Cutlip's blood, the draw did not substantially comply with Section 4511.19(D)(1)(b) of the Ohio Revised Code and Section 3701-53-05(B) of the Ohio Administrative Code. The trial court correctly suppressed the blood-alcohol test results. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellant.
 SLABY, J., CARR, P. J. CONCUR *Page 1